Jermaine L. KING, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 212, 2009.

Supreme Court of Delaware.

Submitted: Oct. 28, 2009.
Decided: Nov. 12, 2009.

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, DE, for appellant.

Abby Adams, Esquire, Department of Justice, Georgetown, DE, for appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

HOLLAND, Justice:

This is defendant-appellant Jermaine King's ("King") direct appeal from several drug-related judgments of conviction in the Superior Court. In this appeal, King challenges the Superior Court's denial of his motion to suppress drugs seized by the police. King contends that the probation officers' search of his home was unlawful. According to King, they failed to corrobo-

rate the information received from a confidential informant through a police officer. King also argues that the probation officers failed to provide the justification necessary both to substantially depart from the required search procedures and to conduct a nighttime search.

We have concluded that King's claim is without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

At approximately 8:45 p.m. on May 28, 2008, members of the Governor's Task Force ("GTF") arrested an individual who was in possession of 7 grams of crack cocaine. The GTF took the individual to Delaware State Police Troop 3 where Trooper Hake, also a member of the GTF, interrogated him. The interrogation was monitored from the GTF offices through the use of closed circuit television by Probation Officers McClure ("P.O. McClure") and Allfather ("P.O. Allfather"), who are also members of the GTF.

Facing significant jail time, the individual became a confidential informant ("CI") and provided information on other alleged drug dealers in the area. First, the CI identified a marijuana dealer by his given name, with whom Corporal Hake was familiar. The CI gave facts consistent with the officer's knowledge of that drug dealer, including a description of two automobiles he used to deal drugs and the caliber handgun he possessed. The CI identified a second drug dealer by given name and nickname, who sold crack cocaine. Corporal Hake was aware of an individual by that nickname who was involved in crack cocaine sales. The CI identified a third individual by her given name. The officer was not familiar with that person.

In the GTF offices, the probation officers watched and listened to the interview. P.O. McClure first knew of the marijuana

dealer because he had performed curfew checks on him. Further intelligence confirmed the CI's statement regarding the type of handgun the marijuana dealer used. P.O. McClure was also familiar with King, as he had done a curfew check on him at 11:20 p.m. on April 21, 2008. King, in violation of his probation, had not been at home. P.O. McClure stated that when he had gone to King's residence, a woman had answered the door. This curfew check was among the information in the Probation and Parole computer information system that P.O. McClure was able to review on the computers in the GTF office while listening to the CI's interview. From this information system, P.O. McClure also learned that King had tested positive for cocaine during a random drug test on May 7, 2008.

Corporal Hake instructed the CI to make supervised calls in an effort to set up a drug deal. The CI used his cell phone and made five phone calls from his contacts list. The first call was answered; however, the individual was suspicious because the CI had purchased a significant quantity of crack cocaine from him earlier that day, and would not make the deal. The second and third phone calls were not answered. The fourth phone call was to the marijuana dealer, who indicated he could not complete a transaction as he was waiting on his supplier for more marijuana.

The fifth phone call was to be directed to King, who was listed in the CI's contact list as "Dreds." The CI told Corporal Hake that King was 32 years old, lived in Milford near the Salvation Army with his girlfriend and that, earlier in the day, King had an ounce of crack cocaine in his possession. The CI stated that he thought the cocaine, as well as a digital scale, would be in a cabinet above the stove in King's house. The CI called the number

listed as "Dred," and a female answered the phone and gave it to King. The CI asked King if he still had the ounce of crack, how much he was "in for" and how much he was willing to sell it for. King stated that he still had the cocaine, and that he had paid $900 for it. King also told the CI that he was on probation and that probation officers had visited him earlier that day.

Neither P.O. McClure, nor his supervisor, P.O. Allfather, could hear the CI's telephone call to King, but Corporal Hake informed them that King had admitted to possessing cocaine in his residence. P.O. McClure then confirmed that King's supervising probation officer had visited King's residence at approximately 12:49 p.m. that day, confirming what King had said in the phone call. Further, P.O. McClure confirmed that King was on conditional release for delivery of a Schedule II narcotic.

P.O. McClure decided he had reasonable grounds to believe that King possessed contraband, and sought approval from P.O. Allfather to conduct an administrative search. P.O. Allfather had been seated next to P.O. McClure in the GTF room, and had observed and listened to the same information that P.O. McClure had observed. P.O. McClure presented the following information in assessing whether there was reasonable suspicion to believe King was in possession of contraband to justify an administrative search: first, King's positive drug test; second, King's failure to comply with curfew; third, that King was on probation for a charge of delivery of narcotics; and fourth, the detailed information from the CI. The CI's information was confirmed by three sources: the case notes, P.O. McClure's personal observation that King did live near the Milford Salvation Army, and King's statement on the phone call that he had contraband.

P.O.s McClure and Allfather did not prepare a pre-search checklist; instead they verbally analyzed the required factors. In determining whether reasonable suspicion existed, the probation officers did not verify whether the CI had been reliable in the past, beyond confirming the information he gave about King and the others with whom they were familiar. P.O.s McClure and Allfather testified that exigent circumstances required prompt action. Specifically, they feared that King could be tipped off and might destroy or sell the drugs, and they were also concerned for the CI's safety. Accordingly, the probation officers executed a search of King's residence at approximately 11:45 p.m. on May 28, 2008. The next day, they prepared their arrest reports.

### Stipulated Trial

King waived his right to a jury trial and the parties agreed to a stipulated bench trial. The following stipulated facts were entered into the record as a court exhibit:

- Members of the Department of Correction, Probation and Parole, conducted an administrative search at Jermaine King's residence on May 28, 2008.

- Members of the Department of Correction, Probation and Parole, located approximately 26.7 grams of crack cocaine in a baggie and a digital scale in the top left dresser drawer in the master bedroom of King's residence. Miscellaneous documents (e.g., Superior Court documents, probation and parole documents and Sprint phone service documents) displaying King's name were also located in the same dresser drawer with the cocaine.

- Members of the Department of Correction located $1,000—worth of United States currency in a Nike Lebron

high top men's size 10.5 shoe in King's residence.

- King made the unsolicited statement, "everything in there is mine; she doesn't know anything about it." King added, "all I have is 27.3 grams of cocaine in the bedroom."

- King provided a statement at Troop 3. King was properly advised of his *Miranda* rights by the Delaware State Police. King knowingly, intelligently and voluntarily waived his rights under *Miranda*. The statement was recorded on DVD. The State will offer the statement in its entirety without redactions.

- The defense will stipulate to the Medical Examiner's report which identifies the substance seized from Jermaine King's bedroom as cocaine and the weight of the cocaine at 25.79 grams.

- The defense will stipulate to the chain of custody and will not require the State to call each witness in the chain.

- The State will call Detective Darrin Short to testify as an expert. The defense will stipulate to Detective Short's expertise.

King was found guilty of one count of Trafficking in 10 to 50 grams of cocaine, one count of Possession With Intent to Deliver, one count of Maintaining a Dwelling and two counts of Possession of Drug Paraphernalia. Pursuant to a motion by the State, King was sentenced as a habitual offender and received twenty years at Level V, plus probation. This direct appeal followed.

1. *Sierra v. State*, 958 A.2d 825, 832 (Del. 2008).

2. Delaware Department of Correction, Bureau of Community Corrections, Probation

### Reasonable Basis to Search King's Home

King contends the Superior Court erred in denying his motion to suppress the evidence seized during the May 28, 2008, search. According to King, the probation officers' search of King's home was unlawful because they failed to independently corroborate the information received from the CI, through a police officer, and failed to provide the justification necessary both to substantially depart from the required search procedures and to conduct a night time search.

██ "[P]robationers do not surrender all of their privacy rights, and probation officers can only conduct searches when they have a reasonable basis to do so."[1] Probation and Parole Procedure 7.19, promulgated under the authority granted by title 11, section 4321 of the Delaware Code, mandates that, prior to conducting an administrative search:

The officer and supervisor will hold a case conference using the Search Checklist as a guideline. During the case conference, the supervisor will review the "Yes" or "No" responses of the officer to the following search decision factors:

1) Sufficient reason to believe the offender possesses contraband.
2) Sufficient reason to believe the offender is in violation of probation/parole.
3) Information from a reliable informant, indicating offender possesses contraband or is violating the law.
4) Information from the informant is corroborated.
5) Approval obtained from Supervisor, Manager, or Director.[2]

and Parole Procedure 7.19 ("Probation and Parole Procedure 7.19"), § VI.A.6 (amended effective June 5, 2001); *see Culver v. State*, 956 A.2d 5, 10 (Del.2008).

Procedure 7.19 requires that probation officers assess the reliability of their informants. Specifically, it requires consideration of the following factors: "was the information detailed, consistent, was the informant reliable in the past, and consider the reason why the informant is supplying the information."[3]

This Court has held that administrative searches of probationer homes require:

[O]nly reasonable grounds, even if the probation officers do not satisfy each technical requirement of the search and seizure regulations of the Department of Correction. The special nature of probationary supervision justifies a departure from the usual warrant and probable cause requirements for searches, but a search of a probationer's home must be reasonable.[4]

■ Here, in assessing whether there was a reasonable basis to conduct the search, the probation officers considered: King's positive drug test; King's failure to comply with curfew; that King was on probation for a charge of delivery of narcotics; and the detailed information from the CI that they were able to confirm from the case notes, P.O. McClure's personal observation that King did live near the Milford Salvation Army, and King's statement on the phone call that he had contraband. These factors combine to form a reasonable basis to suspect that King possessed contraband in violation of his probation.

King contends that this Court's decision in *Culver v. State*[5] requires suppression of the contraband seized. This case is distinguishable from *Culver*, however. In *Culver*, the tip was from an anonymous caller who stated there must be drug activity because people were coming and going from the dwelling.[6] Here, the CI placed a phone call in the presence of the interviewing officer. During that call, King verified that he was on probation, that a probation officer had visited him that day and that he was in possession of crack cocaine.

In King's case, the probation officers satisfied all five requirements for an administrative search under Procedure 7.19. The admission by King during the phone call with the CI that he possessed cocaine satisfies the first two factors. The third factor is satisfied by the numerous facts provided by the CI that the police officer and probation officers were able to verify. The fourth factor is satisfied by King's own statement verifying the CI's assertion that King had crack cocaine in his dwelling. The fifth factor was satisfied because P.O. McClure obtained authorization from P.O. Allfather.

### Departure from Procedures and Night Time Search

■ Nevertheless, King contends that the Superior Court erred in denying his motion to suppress because the probation officers did not follow Department Procedure in authorizing and conducting the administrative search. King further contends that the Superior Court erred in denying his motion to suppress because the evidence was seized during a night time search. King cites no Delaware precedent prohibiting such a search.[7] Proce-

3. Probation and Parole Procedure 7.19, § VI.E.3.b.

4. *Donald v. State*, 903 A.2d 315, 319 (Del. 2006) (internal citation omitted).

5. *Culver v. State*, 956 A.2d at 19.

6. *Id.* at 11.

7. The State, on the other hand, cites to *Himmage v. State*, 88 Nev. 296, 496 P.2d 763 (1972), in support of its proposition that no exigent circumstances are required to perform a night time administrative search.

dure 7.19 does not require exigent circumstances for a nighttime search, but does require completing the search checklist before the search. The search checklist that the probation officers completed states, "[i]f the time of the arrest or search is after 10:00 p.m. and before 6:00 a.m., then reasons must be stated to justify a night time action."

As a condition of King's probation, he signed a document notifying him that he was subject to search at any time. The CI made the first of his five supervised phone calls at 10:35 p.m. The last phone call that night was made to King, who was awake and stated he was still in possession of crack cocaine. P.O. Allfather testified that he "justified the need to do a search due to the fact that the destruction of evidence is a timely issue." Even assuming that exigent circumstances are required, the record supports the Superior Court's finding of exigent circumstances.

In *Fuller v. State,*[8] this Court upheld an administrative search despite the officers' and supervisor's departure from Department Procedure:

In obtaining that approval, the officers and the supervisor considered the information that the Department had and whether it provided sufficient grounds to search. The purpose of the regulations is to ensure that the Department has sufficient grounds before undertaking a search. The individual procedures advance that goal but are not independently necessary, as demonstrated by the fact that the regulations explicitly state exceptions for when the search checklist need not be used. Even if the officers did not follow each technical requirement of the search regulations before searching Fuller, they did satisfy those that affect the reasonableness inquiry

under the United States and Delaware Constitutions.[9]

Similarly, although the probation officers may not have followed every aspect of the Department Procedures, they utilized the factors properly to ascertain that there was reasonable suspicion that King possessed contraband in violation of his probation.

### Conclusion

The Superior Court properly denied King's motion to suppress. The judgments of the Superior Court are affirmed.

8. *Fuller v. State,* 844 A.2d 290 (Del.2004).

9. *Id.* at 292 (internal citation omitted).